# In The United States Court of Federal Claims

No. 08-50T

Filed:  September 15, 2011

_____

| | | |
|---|---|---|
| TIMOTHY L. JENKINS, | * | Tax refund suit; Trial; Responsible officer |
| | * | penalty – 26 U.S.C. § 6672(a); Responsible |
| Plaintiff, | * | person; Founder, major stockholder, primary |
| | * | financier, chief executive officer, publisher, |
| | * | and member of the board of directors was |
| v. | * | responsible person; Willfulness; Obligation |
| | * | to prevent corporate default on payment of |
| THE UNITED STATES, | * | withholding tax obligations; Reckless |
| | * | disregard of knowledge that payment was at |
| Defendant. | * | risk; Unencumbered funds available for |
| | * | payment; Willfulness established; Penalty |
| | * | upheld; Refund denied. |

_____

**OPINION**

_____

*Jane C. Bergner*, Washington, D.C., for plaintiff.

*Allison B. Ickovic*, Tax Division, United States Department of Justice, Washington, D.C., with whom was Acting Assistant Attorney General *John A. DiCicco*, for defendant.

**ALLEGRA, Judge:**

This tax refund case is before the court following trial in Washington, D.C.  At issue is whether plaintiff is liable for a so-called "responsible officer" penalty imposed by section 6672(a) of the Internal Revenue Code of 1986 (26 U.S.C.).  For the reasons that follow, the court finds that plaintiff, indeed, was liable for the penalty in question and, therefore, is not entitled to the refund he seeks.

## I.  FACTS

To say the least, Mr. Timothy L. Jenkins (plaintiff) has had a distinguished career, with a long list of achievements that includes appointments as the interim president of the University of the District of Columbia, a governor of the United States Postal Service, a consultant to the United Nations High Commissioner of Human Rights, and a trustee for Howard University.

Mr. Jenkins and Mr. Gary A. Puckrein were cofounders of Dialogue Diaspora, Inc. (DDI), a corporation which published *American Visions* magazine[1] and promoted African-American culture.  Prior to 1991, Mr. Jenkins and Mr. Puckrein discussed various collaboration opportunities.  Those discussion began to intensify in 1991, when Mr. Puckrein made several offers of employment to Mr. Jenkins.  On or about August 10, 1992, plaintiff and Mr. Puckrein entered into a preorganizational memorandum of understanding governing the creation of the new company.  That agreement provided that the parties would each "hold 50% voting stock in the new corporation with parallel compensation."  It further indicated that Mr. Puckrein would be the President of the corporation (and hold certain roles regarding television programming), while Mr. Jenkins would assume the title of Publisher of *American Visions*.  And it stated that either party would be individually able to sign all checks under $5,000, but that both would be required to sign all checks over $5,000.[2]

On August 26, 1992, plaintiff, Mr. Puckrein and Ms. Joanne Harris (Mr. Puckrein's wife) filed articles of incorporation for DDI with the District of Columbia, which articles were accepted by the District on September 21, 1992.  The articles listed four directors for the company:  plaintiff, Mr. Puckrein, Ms. Harris, and plaintiff's wife, Lauretta Jenkins.  On September 15, 1992, Mr. Puckrein received notification that the *American Visions* trademark had been approved.  On or about September 22, 1992, DDI's new board resolved that plaintiff be appointed Chief Executive Officer and Chief Financial Officer of DDI, with the title of "Publisher," and that Mr. Puckrein and Ms. Harris be hired to serve as the President of the Corporation and editor of *American Visions*, respectively.  It was also resolved that DDI would become the designated publisher of *American Visions* in exchange for its assuming specified debts owed to Brown Printing Company (Brown Printing), which printed the magazine.  The board minutes also reflect that the initial distribution of voting stock was 55 percent to Mr. Jenkins, 22.5 percent to Mr. Puckrein and 22.5 percent to Ms. Harris.

On September 22, 1992, plaintiff, Mrs. Jenkins, Warwick Communications, Brown Printing and Mr. Puckrein (on behalf of DDI) executed an agreement that stated that DDI would become the producer, publisher and owner of *American Visions*.  The agreement described Mr. Jenkins as being "an executive officer and an equity participant" in DDI.  Under the agreement, Brown Printing agreed to continue to print the magazine at its usual and customary rates.  The agreement acknowledged that DDI could not pay Brown Printing on a current basis.  Instead, Brown Printing agreed to continue to print the magazine provided that DDI would: (i) make a

---

[1]  As Mr. Jenkins testified, *American Visions* was –

one of the premier books of aesthetic and cultural interpretation in the Black community, and it really was one of the places where writers, poets, educators had a chance to be heard without being stifled by editorial policies, and it became a beacon in the life of many educators for possible transmission of culture to younger-generation people.

[2]  The record includes various checks suggesting that the counter-signing process described in this provision was never implemented.

series of scheduled payments; and (ii) assume all outstanding obligations owed by Warwick (the prior publisher of *American Visions*).  Plaintiff and Mr. Puckrein, agreed to guarantee jointly and severally all payments due to Brown Printing by DDI, and plaintiff agreed to secure his guarantee with a deed of trust in favor of Brown Printing as to property he owned on S Street, N.W., in the District of Columbia (the S Street Property).

DDI's corporate ledger shows that as of October 3, 1992, plaintiff, Mr. Puckrein, and Ms. Harris owned 550, 225, and 225 shares of DDI's stock, respectively.[3]  On December 2, 1992, DDI (by Mr. Puckrein as its President) entered into a lease with Mr. and Mrs. Jenkins of the S Street Property.[4]  On or about January 26, 1993, plaintiff, Mrs. Jenkins, Mr. Puckrein and Ms. Harris entered into an agreement entitled "Loan Commitment for Start-Up and Operation Costs of [DDI]."  In that document, Mr. and Mrs. Jenkins agreed to: (i) encumber the S Street Property for an amount up to, but not to exceed, $130,000 as security for  Brown Printing;[5] and (ii) lend an amount up to, but not to exceed, $70,000 to DDI for both the direct costs of the publication of *American Visions* during DDI's start-up year and certain other budgeted operating costs.  The agreement established various procedures for drawing on said funds, for security and repayment.  On January 28, 1993, Mr. Puckrein and Ms. Harris both countersigned this agreement, with each being described therein as a shareholder of DDI and Mr. Puckrein being also described as an endorser.

To further secure this loan agreement, on January 27, 1993, DDI's Board of Directors (plaintiff, Mrs. Jenkins, Mr. Puckrein and Ms. Harris) executed a "Stand By Voting Trust and Uniform Commercial Code Security Agreement."  The first part of this agreement established a voting trust.  Mr. Puckrein and Ms. Harris each pledged to that trust approximately five percent of the 225 DDI shares each owned, yielding a total of 22.5 shares.  Plaintiff had the option, by exercising this voting trust, of controlling fifty-five percent of the shares of the corporation.  Plaintiff and Mrs. Jenkins, jointly and separately, accepted the pledges as trustees of the voting trust.[6]

---

[3]   According to this ledger, it thus appears that, as of this time, Mr. Jenkins owned a majority share of the new corporation.  At trial, however, Mr. Jenkins testified that, because of Mr. Puckrein's pending divorce, he agreed to hold temporarily fifty shares of stock initially issued to Mr. Puckrein, with the understanding that Mr. Puckrein could reacquire those shares at a nominal cost of $10.  Describing the motivation for this transaction, Mr. Jenkins testified that he "was prepared to give [Mr. Puckrein] anything that he needed for external issues."

[4]   This lease was for a five-year term, commencing February 1, 1993.  The rent, which was to be paid monthly by DDI, was $6,000 per month net, with an annual inflation escalation clause.  DDI agreed to sublet the fourth floor of the S Street Property to TLJ International, another company owned by Mr. Jenkins, with an annual reduction in the aforementioned rent of $1,500 per month.  The lease provided Mr. and Mrs. Jenkins with various remedies if DDI defaulted on its payment obligation.

[5]   Indeed, it appears that Mr. and Mrs. Jenkins secured the printing agreement with Brown Printing by issuing a deed of trust of this property in the printer's favor.

[6]   In his testimony, Mr. Jenkins described the purpose of the voting trust, thusly –

The second part of this agreement was a loan agreement secured by a factor's lien. This part identified plaintiff, along with his wife, as the "Factor," and DDI and Mr. Puckrein as the "Borrower." The agreement provided that Mr. and Mrs. Jenkins would lend the Borrower an amount to exceed the lesser of either $200,000 or the sum of eighty percent of the net current accounts receivable of the Borrower. This loan was secured in favor of the Factor by a "continuing lien upon all merchandise of the borrower and upon all accounts receivable or other proceeds resulting from the sale or other disposition of such merchandise." The Borrower further assigned to the Factor "all of its merchandise and all of its accounts receivable or other proceeds." This agreement further recited that: (i) DDI would provide monthly detailed financial reports to Mr. and Mrs. Jenkins; (ii) Mr. and Mrs. Jenkins had "all the rights and remedies of [DDI] in respect to the merchandise and the accounts receivable," including the right to receive payments from any person owing an account receivable to DDI; (iii) without notice to DDI, all accounts receivable and proceeds were assigned to Mr. and Mrs. Jenkins; and (iv) the Borrower was restricted from performing a number of activities, including borrowing money (except from the Factor), employing additional employees or increasing their salary, or making any expenditures except in the ordinary course of business.

On May 20, 1994, Mr. Puckrein, in his stated capacity as President and Chief Operating Officer of DDI, and plaintiff, acting as a "Personal Surety," signed an "Interest Bearing Bond" in favor of Hilbert R. Sandholm, through Mr. Sandholm's guardian, Sandra L. Reischel, evidencing a $100,000 obligation owed by DDI to Mr. Sandholm. On October 3, 1994, plaintiff executed a promissory note under which both DDI and plaintiff promised to pay Ms. Reischel $90,000, plus interest, within six months. The note was signed twice by plaintiff, once in his capacity as Publisher/CEO of DDI and again as a personal guarantor. The proceeds of this bond were not used to pay off past debts, but rather for growth opportunities.

Mr. Jenkins provided DDI with funds on other occasions. Between August 17, 1992, and November 9, 1994, he wrote a series of checks on his personal account (or that of TLJ International) payable to DDI (or to *American Visions*), the memo lines on which reflect various purposes relating to the operation of DDI.[7] All these advances, totaling $253,670.90, were made

---

I think it actually was initially suggested by my wife as an additional degree of assurance that if the worst should come to worse, and if something perhaps would happen to Gary Puckrein, that I would be able to not be faced with estate managers and not be able to control the course of the corporation in order to get the reimbursement for our advances in the form of loans.

In this same vein, Mr. Jenkins testified that the document "was calculated that in circumstances [wh]ere they were in default, that we would be able to demand the additional shares necessary to have a majority of the corporate board and control the affairs of the corporation."

[7] These checks are summarized in the following chart:

by plaintiff in response to requests made by Mr. Puckrein.  During this period, Mr. Puckrein was primarily responsible for the day-to-day management of the business.  In addition, DDI had a financial manager, Samuel Collins, who was responsible for processing all checks and performing all payroll tasks, including calculating the tax withholding with respect to payroll. For his part, Mr. Jenkins exercised limited authority over DDI's hiring of certain personnel and over a fund used for the business development activities of the corporation.[8]

An entry in DDI's corporate ledger reflects that as of February 1, 1995, Ms. Harris and Mr. Puckrein each transferred 12.5 shares of their DDI stock to "TL & LC Jenkins, Voting Trustees."  A March 24, 1995, entry in the same ledger reflects that plaintiff transferred fifty shares of DDI stock to Mr. Puckrein.

Some time early in 1995, Mr. Jenkins and Mr. Puckrein had a major falling out.  On March 23, 1995, Mr. Jenkins sent Mr. Puckrein a letter notifying him of a March 31, 1995, meeting of the directors of DDI.[9]  On March 25, 1995, Mr. Puckrein responded, in writing, that he and Ms. Harris did not believe that Mr. Jenkins had the authority to call a meeting of DDI's board of directors and that he and Ms. Harris would not attend that meeting.  This letter accused plaintiff of taking improper actions and indicated that "[u]nder the circumstances, our association must come to an end."  Toward the latter end, Mr. Puckrein purported to instruct plaintiff to

| Check Number | Date | Payee | Amount | For/Memo |
|---|---|---|---|---|
| 237 | 8/17/92 | American Visions | $3,900.00 | Genovese & Assoc., Ck. |
| 5715 | 8/28/92 | American Visions | $ 766.90 | Support Funds |
| 261 | 10/19/92 | DDI | $6,000.00 | Advance for Oct/Nov Factored Receivables |
| 341 | 2/3/93 | DDI | $2,300.00 | Loan to Advance Salaries |
| 360 | 3/1/93 | DDI | $10,000.00 | Brown Printing/Paper from LOC |
| 379 | 3/25/93 | DDI | $40,384.00 | Short Term Loan/Advance #3 |
| 382 | 4/7/93 | DDI | $1,500.00 | Postage Advance |
| 485 | 9/27/93 | DDI | $25,000.00 | Six Month Loan at 10% |
| 548 | 3/28/94 | DDI | $2,500.00 | Compuserv Start-Up Loan |
| 5749 | 10/7/93 | DDI | $40,000.00 | 60 Day Cir. Dev. |
| 5757 | 10/20/93 | DDI | $49,000.00 | Circulation Adv. |
| 564 | 5/9/94 | DDI | $1,667.00 | Adv. Payment to Lauren Gill (McClain) |
| 567 | 5/13/94 | DDI | $61,453.00 | Advance for Brown Printing |
| 674 | 11/9/94 | DDI | $9,200.00 | Payroll Adv. Against Cowles Payment |

[8]  While plaintiff denied this at trial, his testimony was contradicted by his prior deposition testimony in this case, as well as by the deposition testimony he gave in the 1996 lawsuit that he and his wife filed against DDI in D.C. Superior Court.

[9]  The letter in question refers to a meeting of "shareholders," but the context of the letter, as well as subsequent communications referring to the meeting, suggest that the meeting was one of DDI's directors.

cease using any DDI assets for purposes that had not been approved by him and he threatened to file suit against plaintiff.

No later than April of 1995, plaintiff learned from Mr. Puckrein that DDI had been experiencing employment tax problems with the IRS and had entered into an installment agreement with the Internal Revenue Service (IRS) for the payment of those taxes.[10]  On June 2, 1995, plaintiff and Mrs. Jenkins, as members of DDI's board of directors, wrote a representative of the Industrial Bank of Washington (Industrial Bank), directing the bank not to honor any overdrafts or any checks signed by persons who were not named on the DDI board resolution on file with the bank.  This letter further requested copies of DDI's May 1995, bank statement and all checks and wire transfers relating to DDI's account for that month.

Sometime before June 9, 1995, Mr. Jenkins learned that DDI was still not compliant in making its tax payments.  At or around this same time, plaintiff learned that Mr. Puckrein had been secretly operating another company, American Visions Enterprises, some of whose activities paralleled those of DDI.  On June 9, 1995, Mr. Jenkins (as secretary and a director of DDI) and Mrs. Jenkins (as director of DDI) wrote Ms. Harris, calling a special meeting of DDI's Board of Directors for June 12, 1995.  A copy of this letter was faxed to the IRS with the following handwritten message:  "Attn: Mrs. Venita Gardner, Group Manager Collection, Internal Revenue Service, 500 North Capitol Street.  Please note our desire to have one of your agents in attendance at this meeting.  Timothy Jenkins." [11]  The next day, June 10, 1995, Mr.

_____

[10]  In this regard, Mr. Jenkins testified as follows:

Well, I had information I believe as early as April that there had been an IRS issue.  And when I raised that with Gary, he explained that while there had been a lapse in the timely payment of withholding trust funds, that it had been remedied, and they had negotiated an installment agreement that he was then operating under with the approval of IRS.  And hence there was no issue after that.

Nevertheless, under cross-examination, plaintiff admitted that he did nothing to verify Mr. Puckrein's claims that the taxes were being paid.

[11]  Mr. Jenkins testified, at great length, that he did not know the full extent of DDI's employment tax problems until June 9, 1995.  He claimed that, on that day, he discovered papers at DDI's offices indicating that "DDI had defaulted on its installment agreements with the IRS with regard to its trust fund payment" and revealing that Mr. Puckrein had been dealing with Revenue Officer Robert Bendery on this matter.  While plaintiff claims that he had no prior contact with Mr. Bendery, other evidence in the record contradicts this claim.  For example, in explaining why the handwritten message on the June 9 letter inviting the IRS to attend the board meeting was addressed to Mrs. Gardner, plaintiff testified that he had met with Mr. Bendery "on previous occasions, when Mr. Bendery had come to our offices," and did not want him to come to the June 12 meeting unaccompanied.  Mr. Jenkins' claim that he did not meet with Mr. Bendery prior to June 9, 1995, is also contradicted by the deposition that Mr. Jenkins gave in his D.C. Superior Court action against Mr. Puckrein, in which Mr. Jenkins admitted that he had met Mr. Bendery on several prior occasions.

Jenkins had the locks on the S Street Property replaced.  At or about this time, he posted a sign on the door at the entrance to the building, which stated:

> These premises at 2101 S Street, N.W., have been sealed.
>
> The locks have been changed by the owners for nonpayment of rent and to preserve criminal and civil evidence for the Internal Revenue Service.
>
> Any trespass, removal of documents or equipment will be treated as civil and criminal offenses by the owners and the U.S. Treasury Department.  For any further information call (202) 234-[].

On June 12, 1995, Mr. Puckrein wrote Mr. Jenkins protesting the latter's action in changing the locks on the S Street Property and indicating that neither he nor Ms. Harris intended to recognize any of the actions that might be taken at the board of directors' meeting scheduled for later that day.

The DDI board of directors, indeed, met on June 12, 1995.  The minutes of that meeting, which were signed by plaintiff, as Secretary of DDI, reflect that the following individuals were present:  Mr. Jenkins (identified as a DDI director); Mrs. Jenkins (identified as a DDI director); Ms. Harris (identified as a DDI director); Mr. Puckrein; various legal counsel for the parties; and Robert A. Bendery, from the "Collections Dept. of the Internal Revenue Service."  The minutes indicate that Mr. Puckrein and Ms. Harris explained that they were present only to object to the meeting and declare the proceedings to be null and void.  Despite this, the minutes indicate that the following resolutions were adopted by a two-thirds majority of the voting members of the DDI board: (i) that all acts affecting DDI, DDI's staff and DDI's property taken by persons purporting to act on behalf of American Visions Enterprises were null and void; (ii) that Marilyn Crawford was appointed President of DDI; (iii) that Mr. Puckrein was removed as Editor-in-Chief and spokesperson of *American Visions*; (iv) that Ms. Crawford, as DDI's President, and Mr. Jenkins, as the Publisher and Secretary/Treasurer of the DDI Board were the new authorized signatories on DDI's various bank accounts; and (iv) that a DDI Executive Committee was appointed, comprised of Mr. and Mrs. Jenkins.

On June 15, 1995, Mr. Jenkins signed an IRS Form 4180, Report of Interview with Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax.  This form was also signed by Revenue Officer Bendery.  The form reflected, *inter alia*, that plaintiff owned fifty percent of DDI and that beginning in 1992 and 1993, plaintiff had opened corporate bank accounts, signed corporate checks and guaranteed or co-signed corporate bank loans.  The form also indicated that plaintiff had determined "[c]ompany financial policy."  In a later segment, the form indicated that plaintiff had become aware of the delinquent taxes based upon the issuance of DDI's year-end financial statements for 1993 and 1994.[12]  Also on June 15, 1995,

---

[12]  In response to the question – "[w]hat action did you take to see that the tax liabilities were paid?," plaintiff responded – "[r]aised the issue with the President.  Received oral assurances from the President that a payment plan acceptable to IRS had been negotiated and

plaintiff signed an IRS Form 433-B, Collection Information Statement for Business, that had previously been prepared by Revenue Officer Bendery.  This form listed various income and assets owned by DDI.[13]

On July 5, 1995, plaintiff wrote a check on DDI's bank account at Industrial Bank for $16,668.47 made payable to him and Mrs. Jenkins.[14]  Plaintiff later cashed the check and deposited the proceeds into one of his personal bank accounts.[15]  At trial, Mr. Jenkins testified that he wrote this check to himself upon demanding, based upon the factoring agreement, that Industrial Bank provide him with the moneys in the various DDI accounts.  He admitted that at the time he wrote this check, he knew about the unpaid IRS liability.

On July 29, 1995, Mr. Jenkins, Mr. Puckrein and DDI (by Mr. Puckrein) entered into a Stock Purchase Agreement pursuant to which Mr. Puckrein agreed to purchase plaintiff's 500 shares of DDI stock (identified therein as representing 50 percent of the issued and outstanding DDI stock) for $50.  In addition, Mr. Puckrein agreed to discharge DDI's debt to Mr. Jenkins by means of a $200,000 payment due by January 30, 1996.  The agreement further stated that if Mr. Puckrein failed to pay this debt when due, the transferred shares referenced would revert to Mr. Jenkins at the price originally paid.

--------

future accounts would be kept current." This same form indicated that Mr. Puckrein was responsible for a number of other corporate functions, including hiring, managing and firing employees; directing the payment of bills; authorizing bank deposits and payroll checks; and reviewing and signing the company's tax returns.

[13]  It appears that during this same general time period, Mr. Jenkins had a number of contacts with Revenue Officer Bendery in which Mr. Jenkins urged the revenue officer to seize various DDI resources in payment of the outstanding taxes.  At trial, Mr. Jenkins testified that he also provided Revenue Officer Bendery with evidence that Mr. Puckrein was siphoning away funds from DDI in various ways.

[14]  This check was the last of at least twenty-seven checks drawn on DDI's account at Industrial Bank that was signed by plaintiff.  Plaintiff claims that as to the other twenty-six checks, which were dated between June 26, 1993, and May 10, 1995, he made no decision regarding who was being paid or whether the funds were owed, but merely signed checks prepared by DDI employees in the absence of Mr. Puckrein.

[15]  In explaining why he did not use these funds to pay the past due employment taxes, Mr. Jenkins testified –

> My effort was to seize, as a creditor, the funds that were the proceeds of Dialogue Diaspora, and I had a senior obligation for those funds, senior to the IRS claim, and I exercised it free and clear of any IRS obligation pursuant to my entitlement under the creditor's lien, and also the powers to seize proceeds in third parties, hands with or without legal process.

As the foregoing would suggest, for the quarterly tax periods ending March 31, 1993, through September 30, 1995, DDI filed Federal employment tax returns but failed to pay in full to the IRS the liabilities associated therewith.  Mr. Puckrein signed the returns filed during this period.  The liability for the unpaid employment taxes for the first of these periods (that of March 31, 1993) was assessed by the IRS on June 14, 1993.  On August 7, 1995, Mr. Puckrein signed an IRS Form 433-D, entitled a "Tentative Installment Agreement," for payment of DDI's employment tax liabilities.   During this period, DDI became increasingly past-due on its rent payments to plaintiff – as of June 1, 1995, it owed Mr. and Mrs. Jenkins $84,156, and by October 31, 1995, that figure had swelled to $117,381.  On December 1, 1995, Revenue Officer Bendery wrote Mr. Jenkins, indicating that the IRS had been unable to collect trust fund taxes owed by DDI and was prepared to assess a Trust Fund Recovery Penalty against him.  On January 26, 1996, plaintiff responded to this letter, protesting the assessment of a penalty against him.  On June 9, 1997, the IRS denied plaintiff's protest.  On January 28, 1998, the IRS assessed against Mr. Jenkins a penalty of $189,972, pursuant to section 6672(a) of the Code, for failure to pay over withheld employment taxes.

After various procedural steps were taken, in 2005 and early 2006, the IRS collected an amount corresponding to the penalty asserted against plaintiff (plus accrued interest) by levying on plaintiff's individual retirement account and Social Security benefits.  The total amount recovered in this fashion was $264,097.56.  On February 5 and 6, 2007, plaintiff filed a claim for refund seeking the return of these funds.  On May 10, 2007, the IRS send plaintiff a notice of claim disallowance.   Subsequently, plaintiff timely filed this refund suit on January 24, 2008.

Subsequently, in the course of discovery, it was determined that plaintiff's IRS administrative file had been lost.  On April 14, 2010, plaintiff filed a Motion for an Order Shifting the Burden of Production and Proof to Defendant, in which he alleged that the loss of the administrative file, and the concomitant loss of material establishing the historical factual basis for the IRS' assessment of the penalty against him, altered, in his favor, various rules concerning the presumption of correctness and burden of proof ordinarily associated with a tax refund suit.[16]  Following briefing and oral argument on this matter, this court, on July 9, 2010,

---

[16]  In a plain vanilla refund suit, the assessment made by the IRS is presumed to be correct, placing an obligation on the taxpayer to come forward with evidence to rebut a presumption of correctness.  *United States v. Janis*, 428 U.S. 433, 440-41 (1976); *Welch v. Helvering*, 290 U.S. 111, 115 (1933).  Viewed in these terms, the presumption of correctness "is a procedural device which requires the taxpayer to come forward with enough evidence to support a finding contrary to the Commissioner's determination."  *Rockwell v. Comm'r of Internal Revenue*, 512 F.2d 882, 885 (9th Cir. 1975), *cert. denied*, 423 U.S. 1015 (1975).  In addition, a taxpayer in a refund suit also has the burden of proof – the ultimate burden of persuasion.  *See Helvering v. Taylor*, 293 U.S. 507, 515 (1935).  Where the presumption of correctness attaches to an assessment, the taxpayer generally also has the burden on any counterclaim raised by the government relating to the assessment.  *See Adams v. United States*, 358 F.2d 986, 994 (Ct. Cl. 1966).  For a lengthier discussion of these principles, *see Cook v. United States*, 46 Fed. Cl. 110, 113-19 (2000).

granted plaintiff's motion, in part. *See Jenkins v. United States*, 2010 WL 2935791 (Fed. Cl. July 9, 2010). Based on *Cook v. United States*, 46 Fed. Cl. 110 (2000), it held that while the loss of the administrative file did not shift the burden of proof in this matter, it did require defendant to show that a *prima facie* case for the assessment of the penalty existed, *i.e.*, that the assessment was not naked. *Jenkins*, 2010 WL 2935791. Trial in this matter was held in Washington, D.C., from September 27, 2010, through September 30, 2010. Consistent with its prior procedural ruling, the court required defendant to present its evidence first. Based on this evidence, the court found that defendant had produced sufficient evidence for the presumption of correctness to attach to the IRS' penalty assessment. Trial on the merits thus proceeded with the standard presumptions and burdens regarding the conduct of a tax refund suit in place. After the filing of post-trial briefs, closing argument in this case was held on March 17, 2011.

## II.   DISCUSSION

We begin with common ground. Every employer is required to deduct and withhold federal income tax and Federal Insurance Contributions Act (FICA) tax from employees' wages as and when they are paid. *See* 26 U.S.C. §§ 3102 (FICA) and 3402(a) (income tax). Under section 7501 of the Code, such amounts are held in trust for the United States and thus are commonly referred to as trust fund taxes. *See Slodov v. United States*, 436 U.S. 238, 243 (1978). In imposing the obligation to collect these taxes on other than the actual taxpayer, Congress recognized that collectors might fail to set aside and pay over the taxes to the United States. *See United States v. Sotelo*, 436 U.S. 268, 277 n.10 (1978). Where, as here, the collector fails to remit the withheld taxes, the United States must, nevertheless, credit each taxpayer as if the funds were actually paid over. *See, e.g.*, 26 C.F.R. § 1.31–1(a) (2010); *see also Slodov*, 436 U.S. at 243; *United States v. Huckabee Auto Co.*, 783 F.2d 1546, 1548 (11th Cir. 1986). As a consequence, the United States obligates itself to pay benefits such as social security and income tax refunds, for which there is no corresponding revenue. *See Emshwiller v. United States*, 565 F.2d 1042, 1044 (8th Cir.1977) ("any failure by the employer to pay withheld taxes results in a loss to the government in that amount"); *Salzillo v. United States*, 66 Fed. Cl. 23, 31 (2005).

To protect against such losses, the persons responsible for ensuring that the trust fund taxes are paid, who willfully fail to do so, may be held personally liable under section 6672 of the Code. *See* 26 U.S.C. § 6672; s*ee also United States v. Bisbee*, 245 F.3d 1001, 1005 (8th Cir. 2001). Section 6672(a) states in pertinent part:

> Any person required to collect, truthfully account for, and pay over any tax imposed by this title who willfully fails to collect such tax, or truthfully account for and pay over such tax, or willfully attempts in any manner to evade or defeat any such tax or the payment thereof, shall, in addition to other penalties provided by law, be liable to a penalty equal to the total amount of the tax evaded, or not collected, or not accounted for and paid over.

26 U.S.C. § 6672(a). By its terms, then, liability under section 6672 results from the confluence of three factors: "(1) There must be a 'person' who (2) is required to collect, truthfully account for and pay over taxes, but who (3) 'willfully' fails to do so." *Emshwiller*, 565 F.2d at 1045; *see*

*also Vinick v. United States*, 205 F.3d 1, 3-4 (1st Cir. 2000); *United States v. Landau*, 155 F.3d 93, 101 (2d Cir. 1998), *cert. denied*, 526 U.S. 1130 (1999); *Cook v. United States*, 52 Fed. Cl. 62, 68 (2002).[17]

"The first two of these requirements are typically collapsed into the single concept of a 'responsible person,'" this court has stated, "while the willfulness criteria commands separate attention." *Salzillo,* 66 Fed. Cl. at 32. Both the responsible person analysis and the assessment of willfulness are fact-based determinations unique to the circumstances of each case. *See Feist v. United States*, 607 F.2d 954, 957 (Ct. Cl. 1979); *Bauer v. United States*, 543 F.2d 142, 148 (Ct. Cl. 1976). An individual against whom the IRS has made a section 6672(a) assessment ordinarily has the burden of proving, by a preponderance of the evidence, that at least one of the composite elements of liability under that section is absent. *See Landau*, 155 F.3d at 101; *Cook*, 52 Fed. Cl. at 68. And that burden squarely falls on plaintiff here.

### A.      Was Plaintiff a Responsible Person?

Section 6672 of the Code adopts the term "person(s)" as used by section 6671(b), which, in turn, defines person as: "includes an officer or employee of a corporation . . . who as such officer, employee, or member, is under a duty to perform the act in respect of which the violation occurs." Through section 6672 and the definition contained in section 6671(b), the United States seeks "to protect the government fisc by facilitating the collection of taxes from those who have both the responsibility and authority to avoid the default." *Cook*, 52 Fed. Cl. at 68; *see also White v. United States*, 372 F.2d 513, 516 (Ct. Cl. 1967); *Salzillo*, 66 Fed. Cl. at 32. It is a further bedrock principle that the determination whether a person is responsible "is a matter of substance not form and is determined by the coincidence of status, duty and authority" – with the duty to ensure that taxes are paid flowing from authority that enables one to do so. *Cook*, 52 Fed. Cl. at 68; *see also Opliger v. United States*, 637 F.3d 889, 893 (8th Cir. 2011); *Michaud v. United States*, 40 Fed. Cl. 1, 16 (1997); *Ghandour v. United States*, 36 Fed. Cl. 53, 60 (1996), *aff'd*, 132 F.3d 52 (1997) (table).

---

[17]   Section 6672 originated as section 1308 of the Revenue Act of 1918, 40 Stat. 1143, which established a three-tiered scale of penalties for failing to comply with federal excise taxes. *See Slodov*, 436 U.S. at 248-50. The most severe of these prongs imposed a criminal sanction, equal to 100 percent of the evaded or unpaid tax, on any person who "willfully refuses to pay, collect, or truly account for and pay over" certain specified excise taxes. This criminal provision later evolved first to cover Social Security taxes, *see* Social Security Act of Aug. 14, 1935, Pub. L. No. 74–271, ch. 531, § 807(c), 49 Stat. 620, 638, and, ultimately, to reach the failure to pay over the withholding portion of income taxes, *see* Current Tax Payment Act of 1943, Pub.L. No. 68, ch. 120, § 1627, 57 Stat. 126, 138. In enacting the 1954 Code, Congress severed this provision from the other criminal penalties, because it did not provide for imprisonment, and instead grouped it with other assessable noncriminal penalties, renumbering it as section 6672 of the Code. Although both the House and Senate reports commented on this shift, neither otherwise described the purpose of what effectively became a civil penalty. *See* S. Rep. No., 1622, at 5245 (1954); H.R. Rep. No. 1377, at 4568 (1954).

While determining responsibility perforce requires consideration of the totality of the circumstances, the Federal Circuit has outlined a number of relevant considerations:

[A] person's "duty" under § 6672 must be viewed in light of his power to compel or prohibit the allocation of corporate funds.  It is a test of substance, not form.  Thus, where a person has authority to sign the checks of the corporation or to prevent their issuance by denying a necessary signature or where the person controls the disbursement of the payroll or controls the voting stock of the corporation he will generally be held "responsible."

*Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed. Cir. 1984) (internal citations omitted); *see also De Alto v. United States*, 40 Fed. Cl. 868, 876 (1998).[18]  The inquiry thus looks through the

mechanical functions of the various corporate officers, to determine the persons having 'the power to control the decision-making process by which the employer corporation allocates funds to other creditors in preference to its withholding tax obligations.'  The inquiry required by the statute is a search for a person with ultimate authority over expenditure of funds since such a person can fairly be said to be responsible for the corporation's failure to pay over its taxes.

*Godfrey*, 748 F.2d at 1575 (internal citations omitted); *De Alto*, 40 Fed. Cl. at 875; *see also Barrett*, 580 F.2d 449, 452 (Ct. Cl. 1978); *Bolding v. United States*, 565 F.2d 663, 670-71 (Ct. Cl. 1977); *Bauer*, 543 F.2d at 148; *White*, 372 F.2d at 517 ("the courts are looking for the person who could have seen to it that the taxes were paid").

Notwithstanding the "ultimate authority" language employed in *Godfrey*, the Federal Circuit and other courts have made clear that there can be more than one responsible person as "liability attaches to all those under the duty set forth in the statute."  *Harrington v. United States*, 504 F.2d 1306, 1311 (1st Cir. 1974); *see also, e.g., Lubetzky v. United States*, 393 F.3d 76, 80 (1st Cir. 2004); *Gephart*, 818 F.2d at 473; *Godfrey*, 748 F.2d at 1574–75; *Thibodeau v. United States*, 828 F.2d 1499, 1503 (11th Cir. 1987); *White*, 372 F.2d at 516; *Scott v. United*

---

[18]  As noted in *Salzillo*, 66 Fed. Cl. at 32, some courts employ as many as seven factors, including whether the individual: (i) is an officer or member of the board of directors, (ii) owns shares or possesses an entrepreneurial stake in the company, (iii) is active in the management of day-to-day affairs of the company, (iv) has the ability to hire and fire employees, (v) makes decisions regarding which, when and in what order outstanding debts or taxes will be paid, (vi) exercises control over daily bank accounts and disbursement records, and (vii) has check-signing authority.  *See, e.g., Oppliger*, 637 F.3d at 893; *Erwin v. United States*, 591 F.3d 313, 321 (4th Cir. 2010); *Smith v. United States*, 555 F.3d 1158, 1163 (10th Cir. 2009); *Vinick*, 205 F.3d at 7; *United States v. Rem*, 38 F.3d 634, 642 (2d Cir. 1994); *United States v. Carrigan*, 31 F.3d 130, 133 (3d Cir. 1994); *Barnett v. Internal Rev. Serv.*, 988 F.2d 1449, 1455 (5th Cir. 1993), *cert. denied*, 510 U.S. 990  (1993); *Gephart v. United States*, 818 F.2d 469, 473 (6th Cir. 1987).

*States*, 354 F.2d 292, 296 (Ct. Cl. 1965).  "[T]he statute expressly applies to 'any' responsible persons," one court has explained, "not just to the person ***most*** responsible for the payment of the taxes," adding that "[t]here may be – indeed, there usually are – multiple responsible persons in any company."  *Barnett v. I.R.S.*, 988 F.2d 1449, 1455 (5ᵗʰ Cir. 1993), *cert. denied*, 510 U.S. 990 (1993) (emphasis in original); *see also Gephart*, 818 F.2d at 476 ("[w]hile it may be that [other corporate officials] were ***more*** responsible than plaintiff, and exercised ***greater*** authority, this does not affect a finding of liability against the plaintiff" (emphasis in original)); *Godfrey*, 748 F.2d at 1575; *Bolding*, 565 F.2d at 671; *White*, 372 F.2d at 516; *Ghandour*, 36 Fed. Cl. at 61. Accordingly, that Mr. Puckrein has admitted to being responsible for DDI's failure to pay over taxes does not, in and of itself, preclude a finding that Mr. Jenkins is likewise responsible.

Plaintiff contends that he was not a "responsible person" within the meaning of section 6672 for the periods in question.  The record before the court, however, belies this assertion.

It reveals that Mr. Jenkins held various positions of significant authority within the corporation, including Chief Executive Officer and Chief Financial Officer of the corporation. He was, as well, the publisher of *American Visions*, the primary publication of the corporation. He sat on the company's board and, during the period in question, owned (together with his wife) at least fifty percent of the company's stock.  In addition, Mr. Jenkins had the ability to sign checks on DDI's primary bank account and the ability to withdraw funds from those accounts. By virtue of his stake in the corporation and his role as a director, Mr. Jenkins also had the ability to precipitate reorganizations of the corporation's leadership.  What is more, Mr. Jenkins possessed an additional entrepreneurial stake in DDI via his role in financing the company – he provided the initial operating funds for the company by directly extending credit to DDI, and negotiated financing transactions with, and encumbered his property to obtain credit from, third parties.  Because of his diverse roles and owing to the explicit terms of the factoring agreement, plaintiff enjoyed the right to review the corporation's financial records, including records reflecting the company's payroll tax deposits.  Last, but not least, plaintiff was the company's landlord, leasing it the building that was its principal place of business.

Owing to his multi-faceted role within the corporation and his role as a financier of first resort, plaintiff plainly had the leverage and authority to "avoid the default" and demand that the corporation not squander the taxes it withheld from its employees.  *See Feist*, 607 F.2d 960 ("Any corporate officer, or employee with the power and authority to 'avoid the default' or to direct the payment of the taxes is a responsible person within the meaning of section 6672."); *White*, 372 F.2d at 516; *see also Thomas v. United States*, 41 F.3d 1109, 1120 (7ᵗʰ Cir. 1994); *Jenson v. United States*, 23 F.3d 1393, 1395 (8ᵗʰ Cir. 1994).

In arguing otherwise, plaintiff makes several claims.  First, he contends that the court should disregard his various titles, claiming that they did not give him the actual authority to ensure the satisfaction of the tax obligations of DDI.  If, indeed, his titles were mechanical, plaintiff might be right.  *See Barnett*, 988 F.2d at 1455-56; *White*, 372 F.2d at 516.  But, this claim is contradicted by the various occasions on which plaintiff injected himself into the decision-making process of the corporation.  A prime example is plaintiff's activities during the period of June 9-12, 1995.  On the first of these days, when plaintiff allegedly discovered the

- 13 -

depths of the DDI's withholding tax problems with the IRS, Mr. Jenkins locked DDI out of the S Street property, invoking the Treasury Department's name in doing so, and called a meeting of the board of directors to which he invited representatives of the IRS.  And, at that directors meeting, Mr. Jenkins won approval of major changes to the corporation's structure – the firing of Mr. Puckrein, the hiring of a new corporate President, the creation of an Executive Committee of the Board to which he and his wife were appointed, and his designation as having signature authority on all of the corporation's bank accounts.  These actions well-illustrate that Mr. Jenkins was no figurehead, but rather, as his wide experience in managing large organizations would suggest, one who could make his will felt within the corporation when he so desired.

Notwithstanding this, plaintiff stresses that he exercised no day-to-day decision-making authority regarding DDI's federal tax matters – he did not deal with payroll matters and thus had nothing to do with tax withholdings and federal payroll tax deposits; he did not sign any of the corporation's tax returns; and he did not decide whether *vel non* to pay the taxes owed.  And, all this appears true – but irrelevant.  For it is well-accepted that one need not actually perform these tax functions in order to be a responsible person under section 6672.  *See Mueller v. Nixon*, 470 F.2d 1348, 1349 (6th Cir. 1972), *cert. denied*, 412 U.S. 949 (1973).  The question, rather, is whether Mr. Jenkins possessed the effective power to pay the taxes or, at least, to force that action on the part of others.  And he surely did.  Indeed, any question in this regard is answered by plaintiff's dealings with Industrial Bank, which indicate that he had sufficient authority to direct the payment of funds to third parties and to withdraw funds from DDI's accounts as he deemed necessary.[19]  Plaintiff could have wielded this authority – and more – to ensure that the IRS received the tax funds that had been withheld from DDI's employees.  That he failed to do so does not make him any less responsible.

What the Court of Claims held forty years ago is apt here.  In a case similar to this, it observed that "[a]s a general proposition it may be safely postulated that one who is the founder, chief stockholder, president, and member of the board of directors of a corporation . . . is rebuttably presumed to be the person responsible under section [6672] of the Code . . . in the absence of an affirmative showing by him that in actual fact he lacked the ultimate authority to withhold and pay the employment taxes in question."  *McCarty v. United States*, 437 F.2d 961, 967-68 (Ct. Cl. 1971); *see also Feist*, 607 F.2d at 960.  Here, plaintiff was the founder, major stockholder, chief executive officer, publisher and member of the board of directors of DDI.  He was also the corporation's primary financier and its landlord.  And plaintiff has provided no affirmative showing that in actual fact he lacked the ultimate authority to avoid the corporation's default on its withholding tax obligations.  He was then, irrebuttably – responsible.

## B.    Was Plaintiff Willful?

Even a responsible person is not liable for a penalty under section 6672(a) unless his or her failure to collect, account for, or remit withholding taxes was willful.  *Godfrey*, 748 F.2d at 1574.  "Whether 'the failure to pay the overdue taxes [is] willful has been seen . . . as calling for

---

[19]  Those dealings also belie plaintiff's claim that he was unable to direct payments to the IRS because he did not have access to the DDI's checkbooks.

proof of a voluntary, intentional, and conscious decision not to collect and remit taxes thought to be owing.'" *Godfrey*, 748 F.2d at 1576-77 (alterations in original) (quoting *Scott v. United States*, 354 U.S. 292, 295 (Ct. Cl. 1965)). The Supreme Court has indicated that willfulness requires some showing of "personal fault." *See Slodov*, 436 U.S. at 254. "Mere negligence" is insufficient to constitute willfulness under section 6672. *Godfrey*, 748 F.2d at 1577. On the other hand, "it is not necessary that there be present an intent to defraud or to deprive the United States of the taxes due, nor need bad motives or wicked design be proved in order to constitute willfulness." *White*, 372 F.2d at 521; *see also Monday v. United States*, 421 F.2d 1210, 1216 (7th Cir.), *cert. denied*, 400 U.S. 821 (1970) (the individual's bad purpose or evil motive in failing to collect and pay the taxes "properly play no part in the civil definition of willfulness."); *Godfrey*, 748 F.2d at 1577; *Ghandour*, 36 Fed. Cl. at 62.

Limning the appropriate standards to be applied herein, the Federal Circuit has held that willfulness may be shown in at least two ways: (i) "a deliberate choice voluntarily, consciously and intentionally made to pay other creditors instead of paying the [g]overnment" or (ii) "reckless disregard of a known or obvious risk that the taxes may not be remitted to the government." *Godfrey*, 748 F.2d at 1577. Decisions of the Court of Claims are to similar effect. *See Feist*, 607 F.2d at 961; *Bolding v. United States*, 565 F.2d 663, 672 (Ct. Cl. 1977). Under the first of these prongs, a responsible person who pays net wages to employees with the knowledge that there are insufficient funds with which to pay the employment taxes commits a willful failure to collect and pay over under section 6672. *See Emshwiller*, 565 F.2d at 1045; *Sorenson v. United States*, 521 F.2d 325, 328 (9th Cir. 1975). Under the second of these prongs, a responsible person is reckless if he knew or should have known of a risk that the taxes were not being paid, had a reasonable opportunity to discover and remedy the problem, and yet failed to undertake reasonable efforts to ensure payment. *See Whiteside v. United States*, 26 Cl. Ct. 564, 573-74 (1992); *Hammon v. United States*, 21 Cl. Ct. 14, 27 (1990); *see also Colosimo v. United States*, 630 F.3d 749, 753 (8th Cir. 2011); *Wright v. United States*, 809 F.2d 425, 427 (7th Cir. 1987). Under this latter prong, "if the facts and circumstances of a particular case, taken as a whole, demonstrate that a responsible individual knew or should have known that there was a risk that the taxes would not be paid, and failed to take available corrective action, with the result being that the government is not paid taxes to which it is entitled, that individual will be found to have willfully failed to pay over withholding taxes under IRC § 6672(a)." *Ghandour*, 36 Fed. Cl. at 63; *see also Feist*, 607 F.2d at 961 ("Willfulness can be proved by showing that the responsible person recklessly disregarded his duty to collect, account for, and pay over the trust fund taxes or by showing that the responsible person ignored an obvious and known risk that the trust funds might not be remitted.").

Plaintiff claims that he did not willfully fail to collect, account for or remit the withholding taxes owed by DDI because once he found out about that liability, he made every effort to assist the IRS in collecting what it was due. But, this claim proves too much.

For one thing, this claim pivots on the false notion that plaintiff was not obliged to facilitate the collection of the withholding taxes until he supposedly found documents on June 9, 1995, indicating that DDI had defaulted on its installment agreements with the IRS. In fact, the

record demonstrates that, at least as early as April of 1995 – and perhaps well before that[20] –
plaintiff knew that the collection of these taxes was at risk.  By then, plaintiff knew not only that
DDI had been experiencing employment tax problems and had entered into an installment
agreement with the IRS to pay those taxes, but that Mr. Puckrein was unreliable in ensuring that
proper and timely tax payments would be made.  At least from this point, then, plaintiff should
have monitored whether the taxes, in fact, were being paid, and taken corrective action if they
were not.[21]  He could no longer operate on the good faith belief that DDI and Mr. Puckrein
would ensure that the back taxes were paid.  *See Conway v. United States*, 647 F.3d 228, 237 (5th
Cir. 2011) ("we have repeatedly rejected the argument that a taxpayer's good faith belief that
payments for the taxes had been arranged is a defense to personal liability under § 6672").  Yet,
that is exactly what plaintiff did, recklessly disregarding, in the court's estimation, a known risk
that the taxes were not being paid.

At all events, "[e]ven if a 'responsible person' is unaware that withholding taxes have
gone unpaid in ***past*** quarters, it is settled law that a responsible person who ***becomes*** aware that
taxes have gone unpaid in past quarters in which he was also a responsible person, is under a

---

[20]  On June 15, 1995, plaintiff signed an IRS Form 4180 (Report of Interview with
Individual Relative to Trust Fund Recovery Penalty or Personal Liability for Excise Tax) that
reflected that he first became aware of DDI's tax problems in reviewing the corporation's year-
end financial statement for 1993.  While plaintiff testified at trial that information was added to
this form after he signed it, there was nothing to corroborate this claim and his counsel permitted
the document to be admitted into evidence without challenging its authenticity.

Moreover, some of plaintiff's testimony at trial was consistent with the view that he knew
about DDI's tax problems prior to June 9, 1995.  Indeed, plaintiff, at one point, admitted that he
met with Revenue Officer Bendery on several occasions prior to June 9, 1995, presumably based
on concerns that DDI was not keeping current on either its new tax obligations or in making
payments on its installment agreements.  Moreover, plaintiff also testified that, n June 9, 1995,
plaintiff invited Mr. Bender's supervisor to the June 12, 1995, board meeting because he was
dissatisfied with his prior dealings with Mr. Bender.  Of course, plaintiff could not have had that
view of Mr. Bender if, as he contends now, he first discovered Mr. Bender's name while going
through DDI's papers on June 9, 1995, the same day that he sent the meeting notice to the IRS.
Indeed, in deposition testimony that Mr. Jenkins gave in the D.C. Superior Court case he filed
against Mr. Puckrein, he admitted that there was "more than one" meeting with the IRS prior to
the meeting of the board of directors on June 12, 1995.

[21]  *See, e.g., Keller v. United States*, 46 F.3d 851, 854-55 (8th Cir. 1995) (holding that
past tax problems should have alerted responsible person who did not have day to day control
over finances that future taxes might go unpaid); *Malloy v. United States*, 17 F.3d 329, 332
(11th Cir. 1994) (holding that taxpayer disregarded obvious risk of non-payment where he was
aware of prior failure to pay taxes and of the company's financial difficulties and the same
person was still responsible for paying the taxes.); *Vespe*, 868 F.2d 1328, 1335 (3d Cir. 1989)
(willfulness based in part on knowledge of subsequent tax problems which should have
suggested possible problems with payment in past tax quarters); *Wright*, 809 F.2d at 427 (finding
willfulness based in part on knowledge of past tax problems).

duty to use all 'unencumbered funds' available to the corporation to pay those back taxes." *United States v. Kim*, 111 F.3d 1351, 1357 (7th Cir. 1997) (emphasis in original); *see also Thosteson v. United States*, 331 F.3d 1294, 1300-01 (11th Cir. 2003); *Honey v. United States*, 963 F.2d 1083, 1089 (8th Cir. 1992); *Mazo v. United States*, 591 F.2d 1151 (5th Cir. 1979). This rule fully applies to this case. The duty so described extends not only to funds available to the corporation at the time the responsible person becomes aware of the arrearage, but also to any unencumbered funds acquired thereafter. *Garskey v. United States*, 600 F.2d 86, 91 (7th Cir. 1979); *see also Kim*, 111 F.3d at 1357. Failure to take action when there is knowledge of the tax liability constitutes willfulness.[22]

Plaintiff manifestly failed to satisfy his duty to use unencumbered funds to pay back the IRS. True enough, there is little doubt that he had an earnest desire for DDI to pay the back and current taxes it owed the IRS – but only if did not adversely impact his own ability to recoup moneys owed him by DDI. It was in pursuit of the latter goal, and certainly not the former, that three weeks after the critical board meeting with the IRS, plaintiff wrote himself a check for $16,668.45 – the last of at least thirteen checks that he signed between April 12, 1995, and the day he closed out DDI's account at Industrial Bank.[23] Every time plaintiff signed one of these checks, he should have wondered, in light of DDI's history of delinquency, the company's modest size, and the lack of improvement in its bottom line, whether history was repeating itself and he was signing over to creditors (and himself) money that belonged to the United States. He could have confirmed whether this was the case, as he had the right to look at the company's books and the business experience to understand them. But, he did not.

Plaintiff claims that the funds he took were "encumbered" and thus unavailable for payment to the IRS. He argues that his factor lien took priority over the overdue withholding tax obligation, entitling him to any funds that the corporation received from third parties. But, as will be explained, the law does not allow a responsible person to avoid liability for unpaid withholding taxes by enforcing a security arrangement with his own corporation that favors his own interests over those of the United States.

As a threshold matter, a very good argument can be made that, as to at least some of the funds in question, plaintiff's factoring lien did not have priority over the interests of the IRS. It is well-accepted that section 7501 of the Code impresses the taxes withheld from employees with a trust. *See Begier*, 496 U.S. at 60 (the act giving rise to tax liability, *i.e.*, the payment of wages,

---

[22] To be sure, courts have held that if an individual becomes a responsible officer after a withholding tax accrues, that person is not willful if all the available funds to pay the tax are encumbered. *See, e.g., Slodov*, 436 U.S. at 259-60; *Kenagy v. United States*, 942 F.2d 459, 465 (8th Cir. 1991). Along similar lines, the Federal Circuit has held that a responsible person need not "order the impossible." *Godfrey*, 748 F.2d at 1577; *see also Ghandour*, 36 Fed. Cl. at 62. But that is far cry from the case *sub judice* because, unlike in these cases, Mr. Jenkins was a responsible person at the time the taxes in question accrued and were not paid over.

[23] Two of these checks were payroll checks of $974.30 each for his wife, while a third check, dated April 28, 1995, was to himself for $3,483.77.

gives rise to a statutory trust in favor of the United States); *Cabot v. United States*, 38 Fed. Cl. 682, 693 (1997).[24]  Various cases hold that where a corporation commingles the withheld taxes with its other funds and then uses the commingled funds to pay creditors, it should be treated like a trustee who has misappropriated trust funds.  In the latter instance, courts may make "reasonable assumptions" to determine if a nexus exists between the taxes withheld and the funds remaining in the commingled account as of a given point in time.  *Begier*, 496 U.S. at 65 (*quoting* 124 Cong. Rec. 32392, 32417 (statement of Rep. Edwards)); *see also In re Megafoods Stores*, 163 F.3d 1063, 1068 (9th Cir. 1998); *Drabkin v. District of Columbia*, 824 F.2d 1103 (D.C. Cir. 1987).  Under one of these "reasonable assumptions," commonly known as the lowest intermediate balance test (LIBT), that remains in the commingled account is presumed to belong to the beneficiary.[25]  These principles have been extended to tax situations by courts concluding that where a corporation fails to turn over the withheld taxes funds, the minimum balance maintained in a commingled account is impressed by the trust created by section 7501

---

[24]  Congress passed the predecessor of section 7501 as section 607 of the 1934 Revenue Act (c. 277, § 607, 48 Stat. 768).  In explaining the purpose of the statute, the accompanying report stated:

> Existing law provides with respect to a number of taxes that the amount of the tax shall be collected or withheld from the person primarily liable by another person, who is required to return and pay to the Government the amount of the taxes so collected or withheld by him . . . .  Under existing law the liability of the person collecting and withholding the taxes to pay over the amount is merely a debt, and he can not be treated as a trustee or proceeded against by distraint.  Section [607] of the bill as reported impresses the amount of taxes withheld or collected with a trust and makes applicable for the enforcement of the Government's claim the administrative provisions for assessment and collection of taxes.

S. Rep. No. 558, 73d Cong., 2d Sess. 53 (1934).

[25]  *See In re Megafoods*, 163 F.3d at 1066; *United States v. Daniel* (*In re R&T Roofing Structures & Commercial Framing, Inc.*), 887 F.2d 981, 987 (9th Cir. 1989); *Matter of Wellington Foods, Inc.*, 165 B.R. 719, 727-28 (Bankr. S.D. Ga. 1994); s*ee also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 102 (3d  Cir. 1994); *In re Al Copeland Enters., Inc.*, 133 B.R. 837, 840 (Bankr. W.D. Tex. 1991), *aff'd*, 991 F.2d 233 (5th Cir. 1993) (applying LIBT to a Texas statute patterned after section 7501).  In *In re Kountz Bros.*, 79 F. 2d 98 (2d Cir. 1935), *cert. denied, sub nom. Irving Trust Co. v. Los Angeles*, 296 U.S. 640 (1935), the Second Circuit, in discussing the application of this trust principle to a bankruptcy trustee, observed –

> Equity marshals the withdrawal against the fiduciary's own funds so long as it can because the result is deemed fairer.  There is good reasons for this because the fiduciary's creditors have accepted the risk of his solvency while his *cestuis* have accepted only the risk of his honesty.

*Id*. at 102.  For a further discussion of the common law roots of this rule, *see Cunningham v. Brown*, 265 U.S. 1, 12-13 (1924); *Schuyler v. Littlefield*, 232 U.S. 707 (1914); *In re Columbia Gas Systems, Inc.*, 997 F.2d 1039 (3rd Cir. 1993), *cert. denied,* 510 U.S. 1110 (1994).

and does not become the property of the corporation.  *See, e.g.*, *City of Farrell*, 41 F.3d at 102; *Daniel*, 887 F.2d at 987; *In re Al Copeland Enters., Inc.*, 133 B.R. at 837.  Under these cases, it would appear that plaintiff's factor lien took a backseat to the interests of the IRS at least insofar as the lowest intermediate balance of the commingled fund.[26]

But even if plaintiff's factoring lien somehow had priority over the trust created under section 7501, it remains well-established that, for purposes of establishing willfulness, funds are deemed "encumbered" only where "the taxpayer is legally obligated to use the funds for a purpose other than satisfying the preexisting employment tax liability."  *Honey*, 963 F.2d at 1090; *see also Conway*, 647 F.3d at 237 ("funds are encumbered when 'restrictions preclude a taxpayer from using the funds to pay the trust fund taxes.'") (quoting *Barnett*, 988 F.2d at 1458); *Bell v. United States*, 355 F.3d 387, 394 (6th Cir. 2004); *Kim*, 111 F.3d at 1359.  Here, of course, the factoring lien was possessed not by some third party, such as a bank, but by the responsible person himself – plaintiff.  As such, that factoring lien, in no practical or legal sense, precluded plaintiff from using the corporation's otherwise available funds to address the outstanding trust fund taxes.  Indeed, plaintiff's factoring lien did not prevent the company from using funds in its accounts to "make any expenditures . . . in the ordinary course of business," and that is exactly what plaintiff did on various occasions in disbursing corporate funds to utilities, other vendors, and his wife for her salary.[27]  This same provision did not preclude plaintiff from disbursing

---

[26]  Other Supreme Court decisions are not to the contrary.  To be sure, in *United States v. Randall*, 401 U.S. 513 (1971), the Supreme Court held that trust fund taxes could be used to pay the costs and expenses of the administration of a bankruptcy.  *Begier*, however, pointed out that this rule, which was premised on the Court's construction of the interaction between the bankruptcy and tax laws, "did not survive the adoption of the new Bankruptcy Code."  *Begier*, 496 U.S. at 65.  Likewise inapposite is *Slodov*.  In that case, the Supreme Court held that an individual was not personally liable for withholding taxes under section 6672, where he assumed control of the corporation after the time when the delinquency existed and the tax funds were dissipated.  The Court held that this was true even though the corporation later acquired funds that could have been applied to the delinquency.  436 U.S. at 252-53.  Here, however, plaintiff was a responsible person at all time during which the tax delinquency accrued.  *See Kinnie v. United States*, 994 F.2d 279. 285 (6th Cir. 1993).

[27]  *See Kim*, 111 F.3d at 1361 (payment of unsecured creditors establishes that funds are not encumbered); *Purcell v. United States*, 1 F.3d 932, 939 (9th Cir. 1993) (deciding that the company's funds were not "encumbered" by a security interest when there was still flexibility on the use of the funds); *In re Branagan, Jr.*, 345 B.R. 144, 171 (Bankr. E.D. Pa. 2006) ("If a corporation can use its funds to pay legitimate corporate obligations, then such funds are not encumbered.").  Notably, the Fifth Circuit has observed that the existence of secured transactions between a dominant stockholder and the corporation may be relevant in determining whether the stockholder willfully failed to ensure that the corporation's withholding taxes were paid.  *See First Nat. Bank in Palm Beach v. United States*, 591 F.2d 1143, 1149-50 (5th Cir. 1979) ("that a dominant stockholder cast his advances to the controlled corporation in the form of a secured loan transaction may . . . indicate that the corporation was under-capitalized, and that he in essence made the United States an involuntary and unwilling creditor of the corporation by

corporate funds to pay DDI's taxes.[28]  Rather, plaintiff – and plaintiff alone – made the choice to favor himself over the IRS.  And he should not be heard to argue, on the basis of that choice, that the corporations funds were "encumbered" so as to excuse his failure to use those funds to satisfy DDI's employment tax liabilities.  *See Purdy Co. of Ill. v. United States*, 814 F.2d 1183, 1191 (7th Cir. 1987) ("The mere fact that some other creditor, including the taxpayer, might be owed a debt . . . does not alter the general requirement that such funds be paid over against back taxes.").  To permit corporate officers to escape liability under section 6672(a) via agreements that prefer themselves to the government would defeat the purpose of the statute, as it would be the rare officer, indeed, who would not be the effective maximizer of his own self-interest.  *See Kalb v. United States*, 505 F.2d 506, 510 (2d Cir. 1974).

Discretion is power – a commodity to be prized.  And plaintiff had ample power and ability to change the course of events here.  But, he did not.  His claims of obtuseness do not persuade.  Hence, the court finds that plaintiff's nonfeasance, at a minimum, constituted "'a reckless disregard of a known or obvious risk that trust funds may not be remitted to the government.'"  *Oppliger*, 637 F.3d at 894 (quoting *Keller v. United States*, 46 F.3d 851, 854 (8th Cir. 1995)).  As such, his conduct was "willful" within the meaning of section 6672(a).[29]

## III.    CONCLUSION

The court will not gild the lily.  It understands that Mr. Jenkins is frustrated.  Although the court cannot stand in his shoes, there is little doubt that he suffered grievous wrongs at the hands of others involved with the operations DDI.  But, what happened to plaintiff, bad as it was, neither gave him license to engage in self-help insofar as the interests of the United States were concerned, nor relieved him of the overarching responsibility he had to ensure that DDI did not

---

placing on the government alone the risk that funds would be available for the payment of withholding taxes").

[28]  *See Colosimo v. United States*, 707 F. Supp. 2d 926, 944 (S.D. Iowa 2010), *aff'd*, 630 F.3d 749 (8th Cir. 2011) (funds not encumbered where bank did not restrict company from using funds to pay trust fund taxes); *In re Robertson*, 354 B.R. 445, 452-53 (Bankr. W.D. Tex. 2006) (funds not encumbered where no evidence "that the bank would not let them pay the IRS").  Indeed, it should not be overlooked that DDI likely would not have generated the revenues from which plaintiff reimbursed himself had it not previously diverted funds owed to the United States to the payment of its employees and creditors.  In this regard, it is often said that "the government cannot be made an unwilling partner in a floundering business."  *Collins v. United States*, 848 F.2d 740, 741-42 (6th Cir. 1988).

[29]  In arguing that his conduct was not "willful," plaintiff also asserts that the IRS did not vigorously pursue assets that he identified.  The IRS, however, is not required to attempt collection against the corporation before assessing a penalty against a responsible person such as Mr. Jenkins.  *See Bradley v. United States*, 936 F.2d 707, 710 (2d Cir. 1991); *Calderone v. United States*, 799 F.2d 254, 257 (6th Cir. 1986); *Datlof v. United States*, 370 F.2d 655, 656 (3d Cir. 1966); *United States v. Sage*, 412 F.Supp.2d 406, 414 (S.D.N.Y. 2006).

default on its tax obligations.  Even in this context, "[t]wo wrongs do not make a right;" they "simply make two wrongs."  *Minnick v. California Dept. of Corrections*, 452 U.S. 105, 128 n.3 (1981) (Stewart, J. dissenting).

Mr. Jenkins was responsible for paying DDI withheld taxes over, he willfully failed to do so and, therefore, is liable for the 100 percent penalty assessed under section 6672(a) of the Code.  As such, the Clerk is directed to enter judgment dismissing plaintiff's complaint.  No costs.[30]

**IT IS SO ORDERED.**

   s/ Francis M. Allegra
Francis M. Allegra
Judge

---

[30]   Unfortunately, this is not the first time this court has had to deal with the loss of an IRS administrative file.  Apart from the legal complexities introduced by such a loss, *see, e.g.*, *Cook*, 46 Fed. Cl. at 120, there are the practical, factual problems posed by the absence of any record of communications between the IRS and a given taxpayer – an absence that, in this case, required the court to render factual findings that might otherwise have proven unnecessary.  In the future, this court may well be required to determine whether the loss of such a file constitutes an act of spoliation.  *See, e.g.*, *United Medical Supply Co. v. United States*, 77 Fed. Cl. 257 (2007).